## COMMONWEALTH vs. KEVIN DAHL.

Suffolk. January 4, 2000. - February 18, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, & GREANEY, JJ.

*Attorney at Law,* Conflict of interest. *Constitutional Law,* Assistance of counsel, Identification. *Practice, Criminal,* Assistance of counsel, Instructions to jury, Capital case. *Evidence,* Religious beliefs, Identification. *Identification. Homicide.*

A defendant convicted of murder in the first degree did not demonstrate that his trial counsel had a genuine conflict of interest by reason of his simultaneous representation of another client on trial in Florida; further, the defendant failed to demonstrate any actual prejudice from the potential conflict. [816-819]

A criminal defendant did not demonstrate any error on the part of his trial counsel that deprived him of potential defenses, and the trial judge did not err in denying the defendant's motion for postconviction relief, correctly concluding that the defendant had voluntarily and knowingly chosen not to testify at trial. [819-820]

In a criminal case, the trial judge correctly concluded in considering the defendant's motion for postconviction relief that defense counsel's decision not to interview two witnesses, whose potential testimony provided tenuous support for or contradicted the defense, was a reasonable tactical decision and did not constitute ineffective assistance of counsel. [820-822]

At the trial of a murder case, the judge should not have allowed evidence of the religious beliefs of a witness to rehabilitate her testimony after cross-examination; however, no compelling reason appeared on the record of the trial to support a conclusion that the defendant was prejudiced in any significant way by the testimony [822-823]; and error in allowing that witness to testify while holding rosary beads did not create a substantial risk of a miscarriage of justice [823-824].

At the trial of a murder case in which a motion judge concluded that the one-on-one and photographic identifications of the defendant were not impermissibly suggestive or otherwise improper, the trial judge properly exercised his discretion to deny the defendant's request for an in-court identification procedure in which the defendant would not be seated with counsel. [824-825]

At a murder trial in which there was no likelihood that the jury did not base their verdict on at least one of the *Cunneen* factors (*Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 [1983]), error in the judge's instruction on extreme atrocity or cruelty regarding "other factors" to be considered could not have prejudiced the defendant [825-826]; and where the evidence demonstrated that the killing was committed, beyond a reasonable doubt,

with no less than an intent to inflict injuries which would cause the victim's death, the judge's erroneous use of "frame of mind" language in the definition of malice likewise could not have prejudiced the defendant [826].

At the trial of a murder case, the judge's erroneous reference to "grievous bodily harm" in defining the third prong of malice could not have affected the jury's verdict, in circumstances in which the evidence did not warrant a finding of a risk of harm less than a "strong likelihood of death." [826-827]

INDICTMENT found and returned in the Superior Court Department on July 2, 1992.

The case was tried before *Robert W. Banks*, J., and a motion for postconviction relief was heard by him.

*Michael J. Traft* for the defendant.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty.[1] His motion for postconviction relief brought in this court pursuant to Mass. R. Crim. P. 30, 378 Mass. 900 (1979), and G. L. c. 278, § 33E, was denied by the trial judge after an evidentiary hearing. Represented by new counsel on appeal, the defendant argues that his trial counsel was subject to a disabling conflict of interest and failed in other respects to provide him with constitutionally adequate representation. The defendant also maintains that a new trial should be ordered because the judge (a) allowed improper character evidence concerning the religious beliefs of a prosecution witness; (b) incorrectly denied the defendant's motion for an in-court identification procedure; and (c) gave erroneous jury instructions on the element of malice and on the factors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216 (1983), for the jury's evaluation of the Commonwealth's contention that the murder was committed with extreme atrocity or cruelty. We discern no basis for a new trial. We also conclude that there is no reason to exercise our authority pursuant to G. L. c. 278, § 33E, to grant the defendant any relief. Accordingly, we affirm the defendant's conviction.

We set forth the facts that the jury could have reasonably

---

[1]The defendant was also convicted of assault and battery by means of a dangerous weapon. This conviction was placed on file with the defendant's consent and is not before us on appeal. See *Commonwealth* v. *Johnson*, 422 Mass. 420, 421 n.1 (1996).

found based on the Commonwealth's evidence. In the early morning hours of July 13, 1992, the victim, Andrew Stephen McDonough, Jr., accompanied by two women friends and three male friends, set out to attend an "after party" in the South Boston section of Boston. The group saw two females standing outside as they approached 113 L Street, and it appeared to them that a party taking place there was possibly the one to which they were invited. They parked the victim's truck and went in to the party at the home of Brian and Kevin Lynch, whose parents were not at home. Kevin Lynch told the victim and his friends to leave the party because it was too crowded, and they did so without incident.

As the group was walking back to the truck, they encountered three individuals standing next to it, and a fistfight ensued between Paul Supplee, one of the defendant's friends, and Ned Morrissey, the victim's friend. As the fight continued, someone called for others to come out from the party. People poured out of 113 L Street, including the defendant, Tara Costello, Patrick Walsh, and others.[2] On their way out, several people attending the party grabbed golf clubs from a golf bag that was being used to prop open the front door of the house.

Outside, fistfights broke out among several people. The victim became separated from all of his friends except Theresa White. Several members of the group from 113 L Street approached and surrounded the victim, attacking him in concert. Some of the attackers struck the victim with golf clubs. The defendant struck the victim on the back of the head with a golf club, knocking him to the ground. The defendant then jabbed the victim repeatedly with the jagged end of a broken golf club, and used it as a spear, impaling the victim with it. Other individuals also struck and kicked the victim as he lay on the ground, pleading for them to stop. The attack lasted for several minutes, at which point the attackers ran back into 113 L Street, leaving the victim motionless on the ground. The victim died as a result of the injuries.

The medical examiner testified that the victim died of multiple stab and "chopping" wounds. The victim sustained a laceration to the back of the left side of his head which penetrated through

---

[2]The defendant was tried along with Tara Costello, Paul Supplee, and Patrick Walsh, who were all acquitted by the jury of the murder charge. The jury convicted Costello and Supplee of assault and battery by means of a dangerous weapon, but acquitted Walsh of that charge.

the scalp to the brain. This injury was consistent with the victim's having been struck by the metallic head of a golf club. The victim also sustained a three and one-half inch deep stab wound to his back that pierced his diaphragm and entered his abdomen and was consistent with the victim's having been stabbed with the jagged end of a broken golf club. The victim also had several abrasions and bruises over his face, eyes, nose, and ears that were consistent with blows from a blunt object, and numerous stab wounds that were consistent with having been caused by the broken end of a golf club shaft. One stab wound was consistent with a jagged instrument passing completely through the victim's right arm.

1. We first take up the defendant's assertion that his trial counsel was subject to a conflict of interest when the crucial strategic decision whether the defendant would testify was made, so that the defendant was deprived of his right to representation by a trial lawyer who was free of a conflict of interest, as well as his right to constitutionally adequate representation. Specifically, the defendant asserts that his trial counsel's attention to his representation was impaired by counsel's loyalty to another client, whom counsel was simultaneously representing in a capital case in Florida.

In his memorandum of decision on the motion for a new trial, the judge made the following findings on the issue. While unforeseen events caused this trial to continue after the beginning of the trial in Florida, local counsel in Florida was acting as lead counsel in the Florida case, and the presence of the defendant's trial attorney was not required at that trial. The defendant's trial counsel spoke with the defendant several times before and during the trial regarding whether he would testify, and the defendant only wished to testify if such testimony became totally necessary. Several important considerations, including potentially inconsistent prior statements as well as inherent risks of testifying, compelled the defendant's trial counsel to discuss with the defendant whether the defendant should testify. Just before the defense rested, the defendant's trial counsel again consulted with the defendant on the issue whether he would take the stand. The defendant understood his constitutional right to testify.

We examine the defendant's contentions under the standard provided for by art. 12 of the Massachusetts Declaration of Rights to protect a defendant's right to unimpaired assistance of

counsel. That standard is more rigorous than its equivalent under the United States Constitution and is, therefore, more favorable to a defendant. The standard was stated in *Commonwealth* v. *Fogarty*, 419 Mass. 456, 459 (1995), as follows:

> "If a defendant demonstrates an actual conflict of interest, art. 12 does not require the defendant to show that the conflict resulted in actual prejudice or that it had an adverse effect on his counsel's performance. *Commonwealth* v. *Shraiar*, 397 Mass. 16, 20 n.3 (1986); *Commonwealth* v. *Hodge*, 386 Mass. 165, 170 (1982) ('having established a genuine conflict of interest, [the defendant] was required to prove neither actual prejudice nor adverse effect on his trial counsel's performance to entitle him to a new trial under art. 12'). However, where a defendant can show nothing more than a potential conflict, the conviction will not be reversed except on a showing of actual prejudice. *Commonwealth* v. *Epsom*, 399 Mass. 254, 262-263 (1987); *Commonwealth* v. *Shraiar, supra* at 24, and cases cited."

No genuine conflict of interest has been demonstrated. A genuine conflict of interest arises where the "independent professional judgment" of trial counsel is impaired by a conflict between the interests of his client and his own interests, or the interests of another client. *Commonwealth* v. *Shraiar*, 397 Mass. 16, 20 (1986). The fact that the defendant's trial counsel had two clients whose cases, due to unforeseen events, simultaneously went to trial, does not show conflicting interests between these two clients that would affect his ability to exercise independent professional judgment. See S.J.C. Rule 3:07, Canon 5, as amended, 419 Mass. 1302 (1995) (since superseded). As the judge correctly observed in his memorandum on the motion for a new trial, "[s]cheduling difficulties have become a regrettable reality in the practice of law," and skilled trial attorneys, like the defendant's trial counsel, are often forced to manage numerous cases as part of their trial practice. The predicament faced by the defendant's trial counsel was unfortunate, but one that is inherent in the practice of any successful criminal lawyer.[3] The United States Court of Appeals for the Second Circuit has

---

[3]While a judge spoke at a status conference in terms of certainty as to the expected termination date of the defendant's case, such prognostications are not infallible with respect to matters of trial scheduling. They are expressed in

aptly summarized the essence of the issue in the following terms: "In order to classify this kind of conflict as a per se [constitutional] violation, we would have to conclude that virtually all busy defense attorneys, who may consider limitations on their own time when scheduling matters before the courts, or who have more than one client and schedule matters based on clients' needs, are inherently incapable of providing an adequate defense that would satisfy the requirements of the [Constitution]. That, we are not prepared to do." *United States* v. *Zackson*, 6 F.3d 911, 921 (2d Cir. 1993). We agree with these comments.

The difficulty the defendant's trial counsel was facing between the demands of this trial and his representation of his client in Florida at most, therefore, posed a potential conflict. See *Commonwealth* v. *McGuire*, 421 Mass. 236, 241 (1995). As to that possible conflict, the defendant has failed to show that he incurred any actual prejudice. See *Commonwealth* v. *Fogarty, supra.* The defendant now argues that his entire defense had been predicated on the presentation of his own testimony, which would have provided evidence that the defendant had been assaulted before he entered the fray and that the defendant had been intoxicated that night. The defendant claims that prejudice occurred when his trial counsel abdicated his responsibility to provide appropriate advice, leaving the defendant alone in his decision not to testify (a decision which the defendant feels in retrospect was a mistake).[4]

At the evidentiary hearing on the defendant's motion for postconviction relief, the judge heard testimony of the defendant's trial counsel that, although he did the best he could in the circumstances, he had felt "tugged in two different directions" when consulting with the defendant about his decision whether to testify. The judge also had before him affidavits of the defendant's trial counsel and the defendant, in which both attested that trial counsel did not properly advise the defendant on his decision to testify. The judge rejected this evidence, however, with clear findings to the contrary, and concluded that

good faith, based on the judge's current assessment of the court docket, but provide no basis for reliance on the part of counsel.

[4]We need not address the defendant's argument that the judge should have held a colloquy with him on the issue of his trial counsel's potential conflict because the defendant did not ask for a colloquy, and we do not deem one necessary in these circumstances.

the defendant's trial counsel had adequately advised the defendant regarding the issue, and that the defendant made an informed and voluntary decision when he waived his right to testify. These findings will not be disturbed on appeal absent clear error, *Commonwealth* v. *Herbert*, 421 Mass. 307, 313 (1995), and there is no such error here. It is undoubtedly true, as the defendant's trial counsel testified at the evidentiary hearing, that he spent a great deal of time preparing for the Florida case and traveled to Florida whenever possible to participate in that client's case. There is nothing in the record, however, to suggest that the defendant's trial counsel conducted anything less than a vigorous defense on behalf of the defendant.[5] We agree with the judge's conclusion that no material prejudice resulted from the defendant's trial counsel's dual representation of the defendant and a defendant on trial in Florida. Because there was no material prejudice, we conclude that there was no conflict of interest.

2. The defendant's assertion that he was deprived of constitutionally adequate representation involves further claims that his trial lawyer (a) failed adequately to advise him on the crucialness of his testimony and (b) failed to interview others charged with participation in the attack. The defendant contends that, as a result of these failures, he was deprived of several potential defenses. We disagree.

We examine the claims under the standard that applies to such an assertion in a capital case, which is more favorable to the defendant than in an ordinary case. In capital cases, we do not focus on the adequacy of trial counsel's performance. Instead, we determine "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*,

---

[5] On several occasions during the trial, the defendant's trial counsel indicated to the judge that he felt he could not adequately represent his client due to the tremendous pressure of having two clients on trial simultaneously in different States, the stress of traveling to Florida on weekends, and a lack of sleep. The judge repeatedly assured the defendant's trial counsel that, in the judge's view, his representation of the defendant had been exemplary. Our review of the record of the trial independently confirms that the defendant was given a first-rate defense by his trial counsel that centered primarily on the issue whether the Commonwealth had proved beyond a reasonable doubt the defendant's identity as the person who inflicted the brutal injuries that killed the victim.

411 Mass. 678, 682 (1992). We now turn to the defendant's specific arguments.

(a) The defendant asserts that his trial counsel's failure properly to advise him on whether he should testify was error. We concluded above, however, that, based on the judge's findings, the defendant's trial counsel adequately advised the defendant on whether he should testify, and the defendant made an informed and voluntary decision when he chose not to testify. Because there was no error on the part of the defendant's trial counsel, the defendant's claim of ineffective assistance of counsel based on his failure to testify is unavailing.

The defendant amplifies his claim of ineffective assistance by arguing that, because the judge had ruled favorably on the inadmissibility of several of his prior convictions, there was no tactical reason to forgo his testimony. The defendant asserts that his testimony was crucial to support his various defenses that he was not involved at all; that he had been a participant but had acted without malice, either by using excessive force in self-defense or in sudden combat; or that he was so intoxicated he lacked responsibility for his actions. By not urging him to testify, the defendant asserts that his trial counsel effectively deprived him of these defenses.[6] These assertions lack merit. The judge found in his memorandum on the defendant's motion for postconviction relief, and we agree, that the defendant understood that the decision to testify was ultimately his to make, and he voluntarily chose not to testify, based on the primary defense he was asserting at trial, namely, that the Commonwealth could not satisfy its burden of proof as to identification.[7]

(b) The defendant further claims error in his trial counsel's

[6]At the evidentiary hearing on the defendant's motion for postconviction relief, the defendant's trial counsel testified, when pressed for details of what had occurred during the final conference between himself and the defendant on whether the defendant would testify, that the defendant appeared reluctant to testify. The defendant's trial counsel stated, "It was my opinion that my client had some ambivalence about whether or not he should or would or could testify. And, in those circumstances when a client has that kind of ambivalence, even though he has some constitutional matters, it [is] the client's decision. The lawyer has a bigger job to play."

[7]The defendant makes one other claim relating to his failure to testify. The defendant asserts that without his testimony, his trial counsel failed to produce evidence, promised in his opening statement, that the defendant was intoxicated and that the defendant had been struck by a golf club. The defendant maintains that this failure is in itself a manifestation of ineffective

failure to interview and call as witnesses other participants in the fray who had pleaded guilty to manslaughter and therefore were available as witnesses. Jason Clifford testified at the evidentiary hearing that he was the one who first struck the victim with a golf club, and that the victim then grabbed the club from Clifford's hands and used it to strike the defendant. Kevin Lynch testified at the evidentiary hearing that he was involved in a scuffle with the victim, who swung a golf club at a group of people standing around him, hitting the defendant. The defendant argues that without speaking to these witnesses, his trial counsel was unable to assess whether they could provide the defendant with helpful testimony. The defendant asserts that the testimony of these two men could have supported his account that he was not the one who dealt the fatal blow, or at least could have justified his actions in striking the victim as self-defense. In essence, the defendant contends that, because of his trial counsel's failure to interview and call these two potential witnesses (coupled with his own failure to testify), the jury "only heard one side of the story."

The judge in his memorandum made the following findings on this aspect of the case. Neither Clifford nor Lynch claimed to have seen the actual beating of the victim, and so could not have accounted for the whereabouts of the defendant during the time of the attack. Their testimony, therefore, would have tenuously supported the defendant's version at best, and, at worst, would have contradicted the defendant's primary defense, which suggested that he did not participate in the beating of the victim at all. During the colloquy conducted at their plea hearings, both men stated that they agreed with the facts as summarized by the prosecutor, and both responded negatively when asked whether any of the facts were different from those described.[8] The defendant's trial counsel knew of the substance of the

assistance. We disagree. The defendant's trial counsel did produce evidence that the defendant had a history of alcoholism and that the defendant may have suffered a facial injury during the altercation. There was evidence that a substantial amount of liquor was served at the party. The defendant's trial counsel expertly used this evidence to argue to the jury that, if they believed that the defendant participated at all in the attack, the defendant's participation was, at most, as a player in a drunken brawl.

[8]The prosecutor at the plea hearings summarized the relevant facts as follows: "Kevin Dahl rushed up to [the victim] with a golf club and struck him in the back of the head causing the club to come apart. He was joined by [a codefendant] who, at that time, both of them, began to strike [the victim] with

sworn accounts of Clifford and Lynch. Noting the potential problems that the testimony of Clifford and Lynch would have created, the judge concluded that the defendant's trial counsel made a reasoned and informed tactical decision in not interviewing Clifford and Lynch or considering them as potential witnesses.

As we have said in one capital case subject to G. L. c. 278, § 33E review: "An attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made." *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). Aware of the sworn statements of Clifford and Lynch at their plea hearings, the defendant's trial counsel undoubtedly knew these men could offer little or no assistance to the defense and would be open to damaging impeachment if called as witnesses, no matter what they might have testified to in the defendant's favor. We conclude that the defendant's trial counsel's decision not to interview Clifford and Lynch was, when made, tactical in nature, and was reasonable.

3. One prosecution witness was allowed to testify as to her religious beliefs. This witness had originally told the police that she did not see who was involved in the attack, but later that day identified the defendant as the assailant who stabbed the victim. The witness testified, with no objection, that she decided to come forth with her knowledge only after consulting with her priest. On recross-examination by counsel for codefendant Patrick Walsh, whom the witness did not identify as an attacker, the witness was allowed to testify that she was considering studying to be a nun. The witness stated, "I want to do a godly thing." When asked whether she took the oath (to tell the truth) seriously, the witness responded, "Absolutely." The defendant's trial counsel objected to this testimony, and the defendant now claims that the admission of this character evidence concerning the witness's religious beliefs was prejudicial error.

We have long and consistently disfavored allowing evidence of the religious beliefs of a witness either to enhance or discredit the credibility of a witness. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 693 (1983); *Allen* v. *Guarente*, 253 Mass. 152, 154-156 (1925); *Commonwealth* v. *Burke*, 16 Gray 33 (1860); *Commonwealth* v. *Buzzell*, 16 Pick. 153, 156 (1834); *Commonwealth*

---

the golf club, using the club quite literally as a spear, putting the club through and through his body."

v. *Murphy,* 48 Mass. App. Ct. 143, 144 (1999). See also Proposed Mass. R. Evid. 610 ("Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced"). Although the judge allowed the evidence only to rehabilitate the witness after her truthfulness had been attacked,[9] see *Commonwealth* v. *Sheline,* 391 Mass. 279, 287-288 (1984), the testimony should not have been admitted. We conclude, however, that the evidence did not prejudice the defendant in any significant way. It is obvious from the transcript of the trial, including sidebar conversations between the judge and counsel, that this witness was intelligent and forthright. The jury likely would have found her a credible witness had they not been made aware that she was considering a religious vocation. Further, this witness was only one of four eyewitnesses who positively identified the defendant as having attacked the victim. There is no compelling reason to believe that the jurors were swayed in their decision as to the issue of identification by evidence that one of the witnesses was considering studying to be a nun. Cf. *Commonwealth* v. *Mahdi, supra* ("[t]he only apparent purpose of such questioning [of the witness's religious beliefs] was to inject racial hatred into the trial").

The defendant points to other events in the case, not objected to at trial, that he now claims compounded the above error: the witness testified holding rosary beads; the witness testified that she had gone to the police with incriminating evidence only after consulting with her priest; and the witness testified that she had attended morning mass and evening family devotions

---

[9] The judge had previously ruled that the fact that the witness was studying to be a nun was inadmissible, but later changed his ruling. When asked during cross-examination by counsel for codefendant Paul Supplee, whom the witness had also identified as a participant in the attack, whether she was "trying to be religious," the witness answered, "I'm trying to live the life I'm supposed to live." At this point, the judge stated that he would allow testimony that the witness was studying to be a nun as evidence of the witness's credibility. The defendant's trial counsel objected and then moved for a mistrial, which the judge denied "especially in light of the fact that the young lady has been testifying in front of you with rosary beads in her hand for the last day and a half and nobody has said a word." The judge went on to warn the defense counsel that they were "contending with an extremely intelligent woman and a powerful woman . . . with tremendous jury chemistry."

on the day of the party.[10] Most of this evidence was unavoidable, as it was part of a factual recitation of the witness's daily activities. We do not agree with the defendant's claim that this evidence added to the prejudicial effect of testimony that the witness was studying to be a nun. The witness should not have been allowed to testify with rosary beads. The defendant voiced no objection at trial, however, and it is unclear from the record whether anyone, save the judge, even noticed. For the reasons stated above, we conclude that the admission of testimony relating to the witness's religious beliefs did not create a substantial likelihood of a miscarriage of justice. Cf. *Commonwealth* v. *Lee*, 394 Mass. 209, 220 (1985) (no substantial risk of miscarriage of justice where prosecutor asked witness about religious beliefs).

4. The defendant and others were positively identified as having been involved in the attack on the victim by two female witnesses during a showup procedure shortly after the police arrived on the scene on the night of the incident. One of the witnesses was later shown a photographic array, and the witness identified the defendant only as someone who "looked familiar." The other witness was not shown a photographic array. Before trial, a judge in the Superior Court (not the trial judge) conducted an evidentiary hearing on motions filed by the defendant and his codefendants to suppress the witnesses' identifications and ruled that the one-on-one showup procedure employed by the police "was not impermissibly suggestive, but rather expeditious and essential to an ongoing police investigation." The motion judge also determined that photographic identifications of various defendants were not impermissibly suggestive or otherwise improper. The motion judge then concluded, globally, that the various "[i]dentifications in this case were reliable." The motion judge's findings of fact and conclusions of law are not challenged on appeal. At the trial,

---

[10]The defendant also argues that prejudice to the defendant was exacerbated by the prosecutor's closing arguments, in which the prosecutor referred to the witness as "[a] young lady who tells you that if it is God's will, not a holy roller, but a religious girl, if it is God's will, she would give her life to the convent. Is she going to consult with a priest and then come in and lie against a close friend?" While we do not approve of these remarks, the defendant voiced no objection at trial, the judge had instructed the jury that closing arguments are not evidence, and we do not believe that they created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Freeman, ante* 111, 119 (1999).

the defendant's trial counsel moved to have a "fair identification procedure" with respect to the female witnesses during which the defendant would not be seated behind him. The judge denied the request, and it is now argued that the denial of the defendant's motion was error. We disagree.

The judge could accept the motion judge's decision concerning the reliability of the two witnesses' identifications as determinative of their admissibility. Although there were weaknesses in the identifications, it was within the sound discretion of the judge to decide that the weaknesses were not so troubling that the extraordinary measure of an in-court identification procedure was called for. See *Commonwealth* v. *Jones*, 362 Mass. 497, 501 (1972). The judge did not abuse his discretion in denying the motion, concluding in substance that the identifying witnesses were present in court and subject to examination, both direct and cross, about the strength and weaknesses of their identifications. See *Commonwealth* v. *Warren*, 403 Mass. 137, 141 (1988), and cases cited.

5. We turn finally to the issues pertaining to the jury instructions.

(a) The judge instructed the jury that, in deciding whether the Commonwealth had shown that the killing was committed with extreme atrocity or cruelty, they were to consider the factors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), which he enumerated, and "other factors may be considered." The case was tried in 1993, before we stated in *Commonwealth* v. *Hunter*, 416 Mass. 831, 836-837 (1994), *S.C.*, 427 Mass. 651 (1998), that a jury must find the presence of at least one of the *Cunneen* factors before they can find that a homicide has been committed with extreme atrocity or cruelty and that language suggesting other factors as determined by the jury was improper. The defendant's trial counsel objected to the definition of "extreme atrocity or cruelty." There is some dispute over the precision of the objection, but we consider the issue adequately preserved because the judge considered its substantive merits in deciding the defendant's motion for postconviction relief. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 553-554 (1998). The incorrect part of the instruction could not have prejudiced the defendant. We agree with the judge's statement in his memorandum of decision on the defendant's motion for postconviction relief that there is no likelihood that "the jury did not base their verdict on at least one of the *Cunneen* factors in light of the

graphic evidence . . . that the defendant struck the victim with a golf club, penetrating the victim's skull and stabbing the victim in the torso with the broken shaft, after the head of the club was broken from the previous impact."[11] See *Commonwealth* v. *Johnson*, 426 Mass. 617, 623 (1998).

(b) The defendant's trial counsel properly objected to the judge's single use of "frame of mind" language ("anger, hatred and revenge") in the definition of malice. The reference was made prior to our disapproval of the phrase in *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995), but the issue, like the *Cunneen* issue previously discussed, was considered on its substantive merits by the judge in his memorandum on the defendant's motion for postconviction relief. The "frame of mind" language could not have had any impact on the jury's decision to convict the defendant in view of the nature of the killing, which was committed, beyond any reasonable doubt, with no less than an intent to inflict injuries which would cause the victim's death.

(c) The judge defined the third prong of malice for the jury by stating that it could be satisfied by "an act creating a plain and strong likelihood that death or grievous bodily harm would follow." Reference to "grievous bodily harm" is wrong. The jury heard that definition twice, once in the main instructions given by the judge at the close of the case, and then again in response to a question from the jury. Despite the repetition of the incorrect language, we are satisfied that the error could not have affected the jury's verdict, because "the evidence [did] not warrant a finding of a risk of harm less than a strong likelihood of death." *Commonwealth* v. *Fryar*, 425 Mass. 237, 248, cert. denied, 522 U.S. 1033 (1997). Compare *Commonwealth* v. *Freeman*, *ante* 111, 122-123 (1999) (repeated stabbing in head, neck, and chest did not warrant finding of risk of harm less than strong likelihood of death), with *Commonwealth* v. *Williams*,

---

[11]The jury were instructed with regard to the defendant's liability both as a principal actor and as a participant in a joint venture. The defendant argues in passing that, because the jury were not required to find that the defendant himself inflicted any of the fatal blows, they did not necessarily rely on one of the *Cunneen* factors in determining his state of mind. This argument has no merit. *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). Even if the jury convicted on the theory of joint venture, they necessarily would have found that the defendant was a willing and active participant in a brutal attack, which encompassed at least one of the *Cunneen* factors.

428 Mass. 383, 388-389 (1998) (prolonged beating with fists did not obviously create plain and strong likelihood of death).

6. We have reviewed the record pursuant to our duty under G. L. c. 278, § 33E, and we see no reason to reduce the verdict of the jury or to order a new trial.

*Judgment affirmed.*